UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 1:10-CV-20005-JORDAN/MCALILEY

CATHY RAYMOND,

    Plaintiff,

vs.

LIFE INSURANCE COMPANY OF,
NORTH AMERICA, a foreign corporation,

    Defendant.

_____/

### DEFENDANT LIFE INSURANCE COMPANY OF NORTH AMERICA'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant Life Insurance Company of North America, ("LINA"), by and through its undersigned counsel, hereby files this Motion for Summary Judgment on Plaintiff, Cathy Raymond's ("Plaintiff"), claim for accidental death benefits pursuant to 29 U.S. C. §§ 1001 *et seq.* ("ERISA").

### SUMMARY OF THE ARGUMENT[1]

Prior to his death, Don Raymond ("Mr. Raymond") was employed with Kellogg Company ("Kellogg") as a truck driver. Kellogg provided its employees with an employee welfare benefit plan (the "Plan"), which provided, among other benefits, group basic life and accidental death insurance benefits. The group life benefits were funded, in part, by Group Accident Policy No. COA 960012 (the "Policy") issued by LINA to Kellogg.

---

[1] Pursuant to Southern District of Florida Local Rule 7.5(C), LINA filed its Statement of Undisputed Facts separately, yet fully incorporates those facts into this Motion for Summary Judgment as if fully set forth herein.

The relevant provisions of the Policy state that a "Covered Accident" is a sudden, unforeseeable, external event that results in a covered injury or covered loss and that is "not contributed to by disease, Sickness, mental or bodily infirmity" and that "is not otherwise excluded under the terms" of the Policy. The Policy expressly excludes benefits for any "Covered Loss" that is directly or indirectly, in whole or in part, caused by or results from the ***medical treatment*** of a sickness, disease, bodily or mental infirmity. Consequently, that the insured's death is determined to be "accidental" is not dispositive of the claim where, as here, one or more of the provisions of the Policy exclude coverage.

Plaintiff brought this suit to recover accidental death benefits under the Policy for the death of her husband, Mr. Raymond, who died on March 18, 2008.[2] Prior to his death, Mr. Raymond suffered from chronic ankle pain and insomnia for many years. As a result, he was prescribed several medications to treat these medical conditions, including Oxycodone/Hydrocodone for his chronic pain and Ambien for the insomnia. Pharmacy records show that Mr. Raymond last filled his prescription for Oxycodone (twice) in December 2007 and his prescription for Ambien in December 2007 and again in February 2008. Mr. Raymond also received medications over the Internet from online physicians.

On March 17, 2008, Plaintiff called paramedics at approximately 6 a.m. and reported finding her husband unresponsive. Thereafter, family members informed the paramedics, and later the hospital personnel, that Mr. Raymond had "taken a handful of pills" at approximately 4 a.m. They believed he may have accidentally overdosed. Despite resuscitative efforts, Mr. Raymond suffered severe anoxic encephalopathy and was placed on life support, which was discontinued the following day.

---

[2] LINA promptly paid Plaintiff's claim for basic life benefits in the amount of $56,000. (AR 251-252).

2

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

CASE NO: 1:10-CV-20005-JORDAN/MCALILEY

The record evidence in this case is clear. There is no dispute that Mr. Raymond suffered from multiple sicknesses and/or bodily infirmities (*i.e.*, insomnia, chronic ankle pain) and that he was prescribed benzodiazepines (Ambien) to treat his insomnia and opiates (Oxycodone/Hydrocodone) to treat his chronic ankle pain. Similarly, there is no dispute that Mr. Raymond died as the result of an opiate and benzodiazepine overdose. Consequently, there is no dispute that Mr. Raymond died as the result of his ingestion of medications specifically prescribed for the medical treatment of his documented sickness and bodily infirmities. Accordingly, accidental death benefits were correctly and reasonably denied under the plain language of the Policy.

## MEMORANDUM OF LAW

### I. SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if, viewing the evidence in the light most favorable to the party opposing the motion, there is no genuine issue to be tried. Fed. R. Civ. P. 56(c). Only genuine disputes of fact that might affect the outcome of the suit under governing law will successfully defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the Court must consider all evidence in the light most favorable to, and resolve all reasonable doubts in favor of, the non-moving party when considering a summary judgment motion, "the non-moving party still bears the burden of coming forward with sufficient evidence on *each element* that must be proved." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). To defeat summary judgment in this Circuit, the non-moving party must provide more than a mere scintilla of evidence. *Earl v. Mervyns, Inc.*, 207 F. 3d 1361, 1365 (11th Cir. 2000). The Eleventh Circuit "urge(s) district courts to take a firm hand and whittle cases down to the few triable claims, casting aside the many non-triable ones ... through

3
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

summary judgment where there is no genuine issue of material fact." *Chapman*, 229 F. 3d at 1027. Applying these standards to this case, summary judgment should be granted.

## II. STANDARD OF REVIEW

Following *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989), the Eleventh Circuit established the following six-step analysis when reviewing an administrator's benefits decision:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential **arbitrary and capricious** standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict of interest, then apply **heightened arbitrary and capricious** review to the decision to affirm or deny it.

*Williams v. BellSouth Telecomms. Inc.*, 373 F. 3d 1132, 1137 (11th Cir. 2004) *overruled on other grounds by Doyle v. Liberty Life Assur. Co. of Boston*, 542 F. 3d 1352 (11th Cir. 2008).

However, in *Metropolitan Life Ins. Co. v. Glenn*, the Supreme Court called into question the application of a heightened arbitrary and capricious standard (i.e., Step (6) above). *Glenn*, 128 S. Ct. 2343, 2351 (2008); *see also Capone v. Aetna Life Ins. Co.*, 592 F. 3d 1189, 1195 (11th Cir. 2010); *Doyle*, 542 F. 3d at 1360. *Glenn* agreed that the proper standard for reviewing a

4
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

conflicted administrator's decision was arbitrary and capricious, but an individualized inquiry is required to determine the circumstances of each decision. *Glenn*, 128 S. Ct. at 2351. Consequently, the Eleventh Circuit has held that *Glenn* overrules cases requiring courts to apply the heightened standard to a conflicted administrator's benefits decision. *Doyle*, 542 F. 3d at 1360. Instead, the existence of a conflict is but one factor for the court to consider when determining whether an administrator's decision was arbitrary and capricious. *Id.*[3] However, even where a conflict of interest exists, courts still owe deference to the administrator's discretionary decision-making. *See Conkright v. Frommert*, 130 S.Ct. 1640, 1651 (U.S. Apr. 21, 2010) ("Court of Appeals erred in holding that the District Court could refuse to defer to the Plan Administrator's interpretation of the plan."); *Capone*, 592 F.3d at 1196 ("the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.").

Based upon the clear language of the Policy at issue, there is sufficient discretion afforded to LINA to trigger the arbitrary and capricious standard of review. Specifically, the Policy clearly and unambiguously states:

> The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed [LINA] as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role [LINA] shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan and to make any related findings of fact. All decisions made by [LINA] in this capacity shall be final and binding on Participants and Beneficiaries of the Plan to the full extent permitted by law.

(AR 288).

---

[3] The *Williams* methodology remains intact, except for the sixth step, as modified by *Glenn*. *See Capone*, 592 F. 3d at 1196.

5
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

Plaintiff has not, and cannot, allege any circumstances, absent the mere presence of the conflict of interest itself, which make this factor particularly important in this case. To the contrary, notwithstanding the circumstances surrounding Mr. Raymond's death, LINA promptly assumed responsibility for and paid Plaintiff's claim for basic group life benefits in the amount of $56,000. Thus, in light of the Supreme Court's decision in *Glenn*, there is nothing in the administrative record before the Court that makes the alleged conflict of interest a particularly important or noteworthy factor. Consequently, the conflict of interest does not weigh in favor of determining that LINA's decision was arbitrary and capricious. *Glenn*, 128 S.Ct. at 2350. This Court must therefore uphold LINA's decision as long as it is "reasonable", even if the Court were to disagree with the decision to deny benefits.

### III. DENYING PLAINTIFF'S CLAIM FOR ACCIDENTAL DEATH BENEFITS WAS THE RIGHT DECISION

LINA's decision to deny accidental death benefits was correct. LINA does not dispute that Mr. Raymond's death was an accidental. However, that his death was considered accidental and, therefore, a "Covered Loss", does not end the inquiry. Rather, the Policy clearly states that LINA must then determine whether this "Covered Loss" (*i.e.*, accidental death) is otherwise excluded under the terms of the Policy. Here, there is no reasonable dispute that Mr. Raymond's death was excluded.

The Policy states that LINA "will pay [a] benefit for any…[Loss of Life], if the Covered Person suffers a Covered Loss resulting directly and independently of all other causes from a Covered Accident…" (AR 293). A "Covered Accident" is defined as a "sudden, unforeseeable, external event that results directly and independently of all other causes,…[and]: is not contributed to by disease, Sickness, mental or bodily infirmity; *[and] is not otherwise excluded under the terms of this the Policy.*" (AR 281) (emphasis supplied). Consequently, the Policy

6
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

clearly states that a benefit will be paid for an accidental death that is not otherwise excluded by the Policy. In other words, the Policy specifically contemplates and identifies situations in which an accidental death is excluded from coverage. Thus, once it is determined that an accidental death has occurred, LINA must determine whether a Policy exclusion applies to that otherwise "Covered Loss."

> Under the "Common Exclusions" provision the Policy states, in relevant part, as follows:
>
> In addition to any benefit-specific exclusions, benefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from any of the following unless coverage is specifically provided for by name in the Description of Benefits Section: ...
>
> 6. Sickness, disease, bodily or mental infirmity, bacterial or viral infection or medical or surgical treatment thereof,...

(AR 286).

"As a general matter, unambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning." *Perreca v. Gluck*, 295 F.3d 215 (2nd Cir. 2002). Further, "where the plan documents unambiguously address the substantive rights of the parties at issue, the plan language controls." *Meadows v. Cagle's, Inc.*, 954 F.2d 686, 691 (11th Cir. 1992). "The general doctrine that policy exceptions and exclusions are to be restrictively read is of course tempered by the rule of reason and the principle that even insurance policies must be given practical, sensible interpretations in accordance with the natural meaning of the words employed. *See Puig v. Citicorp Life Ins. Co.*, 687 So. 2d 852, 855 (Fla. 3d DCA 1996); *see also Swisher-Sherman v. Provident Life & Acc. Ins. Co.*, 1994 U.S. App. LEXIS 28768 at **7 (6th Cir. Oct. 13, 1994) (when "fashioning a body of federal common law, federal courts may look to state law as a guide, unless it is contrary to the provisions of ERISA") (citing *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F. 2d 150, 153 (8th Cir. 1990) *cert denied*, 501 U.S. 1238 (1991)).

7
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

Here, the Policy expressly and unambiguously excludes from coverage accidental death caused by, or resulting from, the medical treatment of a sickness, disease, bodily or mental infirmity. And there is no dispute that Mr. Raymond's death was caused by, or resulted from, the medical treatment of his chronic ankle pain and insomnia. In fact, Plaintiff concedes that at the time of his death, Mr. Raymond had "heavy doses" of prescription medication, "which surely led to his death." (AR 030). "Where the cause of an insured's death is not in dispute, it is purely a question of law as to whether the death resulted from a cause insured against by the policy." *Grobe v. Vantage Credit Union*, 679 F. Supp. 2d 1020, 1030 (E.D. Mo. 2010) (citing Missouri state law cases).

Significantly, courts have long-held that there is no coverage for improper ingestion of medication. *See, e.g., Bayless v. Travelers' Ins. Co.*, 2 F. Cas. 1077, No. 1138 (C.C.E.D.N.Y. 1877), *rev'd on other grounds,* 113 U.S. 316 (19985). In *Bayless*, the insured was prescribed opium by his doctor while recovering from influenza. It was assumed that the insured took too much opium, which had caused his death. The Court held that the insured's death was caused by medical treatment within the policy exception. *Id.* 1078. The Court reasoned that just because the dose taken was not the dose directed by the physician, this fact did not take the case out of the exception in the policy of medical treatment. *Id.* ("the fact that the patient deviated from the direction given by the physician in the matter of amount and upon his own judgment took a larger dose than had been directed, does not change the character of the act. The object of the insured in taking the opium he did was to cure").

Recently, in *Grobe*, the court addressed whether an accidental death from methadone intoxication fell within the policy exclusion of medical treatment of a sickness or disease. 679 F. Supp. 2d 1020. The deceased had a pre-existing medical history of insulin dependent diabetes

8
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

and depression. His physician prescribed methadone for treatment of the insured's medical condition. The court noted that an "exclusion in an AD&D policy for medical treatment of a sickness or disease unambiguously includes death *caused by accidentally overdosing on a drug prescribed by a doctor for a medical condition.*" *Id.* at 1031-1031 (emphasis added) (citing and quoting *Barkerding v. Aetna Life Ins. Co.* 82 F. 2d 358, 359 (5th Cir. 1936). In concluding there was no coverage under the policy, the court referred to *Barkerding*, where the "patient accidentally burned his foot after following a physician's order to use a light bulb to heat his foot, but used a higher watt bulb than was necessary. In that case, the Fifth Circuit held that the `excess heat is like an overdose of a prescribed drug ignorantly taken by a patient, the effect of which is to be the result of medical treatment' under a policy excluding medical treatment." *Id.* at 1032 (quoting and citing *Barkerding*, 82 F 2d at 359. The *Grobe* court further remarked that courts have "consistently held that a medical treatment exclusion applies to accidental death caused by an overdose of drugs prescribed by a doctor in the course of a treatment for a sickness or disease." *Id.* at 1033. Because the deceased had suffered a loss while taking medication that was prescribed by his doctor for the treatment of a sickness or disease, it was not covered. *Id.* at 1034. *See also Puig*, 687 So. 2d at 855 (noting that the "consumption of a medication which has been prescribed by the treating physician falls within the term `medical treatment' and falls with the medical treatment exclusion"). Applying these well-established principals to the undisputed material facts here, there is no dispute that accidental death benefits were properly denied.

Prior to his death Mr. Raymond was receiving medical treatment in the form of prescription medications to treat his chronic ankle pain and insomnia. The medical records from Dr. Esther Levin dated October 20, 2006, note that Mr. Raymond suffered from chronic ankle pain and that she diagnosed him with insomnia. (AR 158). Dr. Levin prescribed Oxycodone,

9
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

which Mr. Raymond filled in November 2006 and refilled in December 2006. (AR 226). Dr. Levin also prescribed Ambien, which Mr. Raymond filled on a regular basis between October 2006 and February 2008. (AR 222). In April 2007, Dr. Levin again noted Mr. Raymond's chronic ankle pain and ongoing insomnia. (AR 156). In November 2007, Dr. Levin diagnosed Mr. Raymond with "Ankle Enthesopathy, Chronic Pain Syndrome, [and] Insomnia." (AR 153). Dr. Levin also referred Mr. Raymond to a Podiatrist, Dr. Christopher Blanco, and Pain Management Physician, Dr. Howard Popp, for continued treatment of his chronic pain. (AR 154). In addition, medical records from Dr. Alicia Chilito dated May 3, 2007, note that Mr. Raymond complained of right ankle pain and was taking up to 10 tablets of Hydrocodone daily. (AR 188, 206). Although she recommended counseling for his opiate use, Mr. Raymond refused. (AR 189, 206).

Further, medical records received from Fort Lauderdale Hospital note that Mr. Raymond voluntarily admitted himself for opiate dependency in April 2007. (AR 197, 200-202). According to Mr. Raymond, his dependency began approximately four years earlier following an ankle injury. (AR 197, 200-202). Thereafter, his ankle pain became chronic and he began taking approximately 20-25 Hydrocodone tablets daily. (AR 200-201). He was also taking Ambien at that time. (AR 197).

Pharmacy records obtained during the investigation establish that Mr. Raymond filled a prescription for Oxycodone from Dr. Chilito on December 3, 2007, and again on December 20, 2007. (AR 226). The pharmacy records also establish that Mr. Raymond filled prescriptions for Ambien from Dr. Levin and/or Dr. Blanco on a near monthly basis, including December 26, 2007 and again on February 8, 2008 (less than one month before Mr. Raymond overdosed). (AR

10
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

222). Finally, in addition to filling prescriptions at a traditional pharmacy, Raymond was receiving narcotic pain medication prescribed over the Internet by online physicians. (AR 079).

Thus, it is undisputed that prior to his death Mr. Raymond suffered from a "sickness, disease, bodily or mental infirmity" in the form of chronic ankle pain and insomnia, and that he received medical treatment for these conditions from multiple physicians in the form of prescription medications, Oxycodone/Hydrocodone and Ambien. And this fact was confirmed by LINA's medical consultant, Dr. Paul Seiferth, who concluded that the medical records reviewed document that Mr. Raymond was diagnosed with two medical conditions for which he received medical treatment in the form of prescription medications - Ambien to treat his insomnia and opiates (Oxycodone/Hydrocodone) to treat his chronic ankle pain. (AR 034).

There is also no dispute that Mr. Raymond's death was caused by or resulted from his ingestion of the medications prescribed to treat his chronic ankle pain and insomnia. Specifically, on March 17, 2008, Plaintiff called paramedics at approximately 6 a.m. and reported finding her husband unresponsive. (AR 72, 139). On arrival, the paramedics found Raymond in cardiac arrest. (AR 139). Family members informed the paramedics, and later the hospital personnel, that Mr. Raymond had "taken a handful of pills" at approximately 4 a.m. (AR 077, 139). The paramedics noted that Mr. Raymond's medications, as reported by his family, included Hydrocodone, Oxycodone, and Ambien. (AR 138). At the hospital, Mr. Raymond's medications were again reported to include Hydrocodone and Ambien. (AR 072). These "home medications" were subsequently reviewed and validated by the admitting physician. (AR 075).

A toxicology screen conducted on admission was positive for opiates (Oxycodone/Hydrocodone) and benzodiazepines (Ambien). (AR 081, 089, 102). In addition, Mr. Raymond's family reported that he was receiving medications prescribed over the Internet

11
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

by online physicians, and they "believe[d] that he had an accidentally overdosed on pain medication." (AR 079). Mr. Raymond was diagnosed with severe anoxic encephalopathy following his ingestion of toxic levels of opiates and benzodiazepines and placed on a ventilator. (AR 062, 079-80, 090). The family decided to cease life support and Mr. Raymond was pronounced dead on March 18, 2008. (AR 080). An autopsy concluded that the cause of death was "Polydrug Toxicity (Benzodiazepines, Opiates)." (AR 092). Mr. Raymond's death certificate also listed the cause of death as "Polydrug Toxicity (Benzodiazepines, Opiates)." (AR 254).

Based on the record evidence, it is undisputed that Mr. Raymond's death was caused by, or resulted from, his ingestion of the medications prescribed by his physicians to treat his chronic ankle pain and insomnia. This fact was confirmed by LINA's Forensic Pathologist, J. Scott Denton, M.D., who concluded, to a reasonable degree of medical certainty, that: (1) the cause of death for Mr. Don Raymond is anoxic encephalopathy due to opiate and benzodiazepine intoxication; (2) Mr. Raymond's brain became anoxic after respiratory arrest due to the intoxication of the combined increased amounts of medication in his blood stream; (3) toxicology reports documenting this intoxication show a positive screen for opiate and benzodiazepines in the urine; and (4) no other finding in the autopsy or within the clinical medical records suggests a contradictory or differing cause of death. (AR 042, 046-47). And again, Plaintiff concedes that at the time of his death Mr. Raymond's heavy doses of prescription medication, "surely led to his death." (AR 030).

In summary, the Kellogg Group Accident Policy clearly states that benefits are not payable for accidental deaths otherwise excluded under the terms of the Policy. The Policy further states that accidental deaths caused by or resulting from the medical treatment of a

12
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

sickness, disease, bodily or mental infirmity are excluded. The undisputed medical evidence establishes that: (1) Mr. Raymond had a history of chronic pain for his chronic ankle injury and insomnia for which he received medical treatment in the form of prescription opiates (Oxycodone/Hydrocodone) and benzodiazepines (Ambien); and (2) Mr. Raymond's death was caused by or resulted from the medical treatment (i.e., the prescription medications) he was receiving for these medical conditions.

In sum, LINA made the right decision to deny Plaintiff's claim for accidental death benefits and is entitled to judgment in its favor on Plaintiff's claim for benefits.

## IV. EVEN IF LINA'S CLAIM DECISION IS WRONG, IT IS NOT ARBITRARY AND CAPRICIOUS

In the event this Court determines that LINA's decision to deny accidental death benefits was wrong, which conclusion LINA disputes, the decision to deny accidental death benefits was reasonable, not arbitrary and capricious, and should not be disturbed by this Court. When a plan grants to the administrator discretionary authority to determine eligibility for benefits and to interpret the terms and provisions of the plan, a court's review is limited to deciding whether the plan fiduciary abused its discretion. *Glenn*, 128 S. Ct. at 2348; *Williams*, 373 F.3d at 1137. Applying the deferential standard of review means that the plan administrator's interpretation of plan provisions "will not be disturbed if reasonable." *Conkright v. Frommert*, 130 S.Ct. 1640, 1651 (U.S. Apr. 21, 2010). Further, the court may not substitute its own interpretation of plan provisions for that of the defendant in determining eligibility for plan benefits. *Id.* at 1651.

In this case, when LINA made its decision that Plaintiff was not entitled to accidental death benefits, it reasonably considered and weighed: (i) the clear and unambiguous language of the Policy; (ii) medical records documenting Mr. Raymond's history of medical treatment, including prescription medications, for chronic pain and insomnia; (iii) medical records

13
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

documenting that Mr. Raymond's death was caused by, or resulted from, his ingestion of toxic levels of opiates and benzodiazepines, which were medications prescribed to treat his medical conditions; (iv) the medical review of Dr. Seiferth, who confirmed Mr. Raymond's history of and treatment for chronic pain and insomnia; (v) the medical review of Dr. Denton who confirmed Mr. Raymond's death was caused by or resulted from his ingestion of opiates and benzodiazepines; (vi) statements made by Mr. Raymond's family to the paramedics and hospital personnel regarding his prescription medications and the events leading up to his death; and (vii) statements made in Plaintiff's request for appeal. Thus, because LINA's decision was reasoned, supported by substantial evidence and not erroneous as a matter of law, the decision to deny accidental death benefits was not arbitrary and capricious.

In addition, Plaintiff was afforded the opportunity to rebut the denial of benefits and to provide evidence to support her claim for benefits. Instead, Plaintiff submitted a two page letter in which she states, without any supporting evidence, that "paragraph 6 [of the Common Exclusions] does not apply...,[and][t]he basis for this position is on the merits."[4] (AR 029). Plaintiff apparently relies exclusively on Dr. Denton's statement that Mr. Raymond's death was "accidental." As discussed in detail above, this argument is without merit. The Policy specifically states that benefits will not be paid for accidental death "otherwise excluded under the Policy." And subsection 6 of the "Common Exclusions" provision specifically excludes benefits under the circumstances of Mr. Raymond's death, accidental or otherwise. Notably,

---

[4] This is also significant because the Eleventh Circuit has held that, under the arbitrary and capricious standard, a court reviewing an ERISA claim decision may "look only to the facts known to the administrator at the time the decision was made." *Glazer v. Reliance Standard Life Ins. Co.*, 514 F.3d 1241, 1246 (11th Cir. 2008). Accordingly, the Court's review on a summary judgment motions is confined to "the administrative record as it existed at the time the administrator denied the claim for benefits." *Richards v. Hartford Life and Acc. Ins. Co.*, 356 F.Supp.2d 1278, 1285 (S.D. Fla. 2004).

14
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

Plaintiff goes on to concede the very basis on which the claim was denied. Specifically, she states "Mr. Raymond had heavy doses of prescript addictive heavy narcotics, which surely led to his death." In other words, Plaintiff concedes that Mr. Raymond had medical conditions for which he was being treated with prescription medication, the ingestion of which caused his death.

Plaintiff has also suggested that because Mr. Raymond allegedly did not fill a prescription for Oxycodone/Hydrocodone in 2008 he was not receiving treatment. However, this argument is both irrelevant and contradicted by Plaintiff's own statements. First, the Plan language makes clear that the exclusion is triggered if Mr. Raymond was receiving medical treatment for his condition. There is no requirement that he receive the medical treatment (i.e., fill his prescriptions) immediately prior to his death; it is enough that he continued treatment[5] once prescribed by Drs. Levin and Chilito for his chronic pain. *See Levin v. Sun Life Assurance Co. of Canada*, 2008 WL 834432, *10 (N.D. Ill. 2008) (plaintiff's voluntary resumption of dietary modifications previously prescribed by a physician constituted "appropriate medical treatment" for his underlying dysphasia). Consequently, because there is no dispute that Mr. Raymond ingested prescription medications to treat chronic pain and insomnia and those medications caused or resulted in his death, when and where he filled the prescriptions for those medications is irrelevant.

Further, Plaintiff's contemporaneous statements to the paramedics and hospital personnel contradict any suggestion that Mr. Raymond had not filled Oxycodone/Hydrocodone

---

[5] There is no dispute that Raymond ingested opiates (Oxycodone/Hydrocodone) on the night he died and that both Dr. Chilito had earlier prescribed Oxycodone/Hydrocodone to treat Raymond's chronic pain.

15
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

prescriptions.[6] Specifically, when the paramedics arrived on the morning of March 17th, Plaintiff reported that Mr. Raymond's current prescription medications included Hydrocodone and Oxycodone. (AR 138). On admission to the emergency room, she confirmed with the triage nurse that Hydrocodone was one of his current medications. (AR 072). Later Plaintiff validated with the admitting physician that the "home medications" included Hydrocodone and Ambien (AR 075) and notified the emergency room physician that Mr. Raymond had been obtaining narcotics prescribed over the internet by online physicians. (AR 079). Finally, in her appeal, Plaintiff concedes that at the time of his death, he had heavy doses of prescription narcotics. (AR 030). In short, though not relevant for the reasons stated above, there is substantial evidence in the record to reasonably conclude that Mr. Raymond had filled, and was in possession of, prescription Oxycodone/Hydrocodone after his last pharmacy visit on December 20, 2007. (AR 226).

Thus, LINA's decision to deny accidental death benefits was reasonable, not arbitrary and capricious, and should not be disturbed by this Court.

---

[6] Logic dictates that Plaintiff made these statements to the various medical personnel as they gathered information on Mr. Raymond's medical history because she believed them to be accurate and relevant to her husband's critical medical condition. *See Veal v. Nationwide Life Ins. Co.*, 2010 WL 1380170, *3 (N.D. Fla. March 31, 2010).

16
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1

CASE NO: 1:10-CV-20005-JORDAN/MCALILEY

## **CONCLUSION**

Based upon the foregoing, Defendant, Life Insurance Company of North America, respectfully requests that this Court grant this Motion for Summary Judgment in its entirety.

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**
*Attorneys for Defendant,*
3800 Bank of America Tower
100 SE Second Street
Miami, Florida 33131
Telephone: (305) 374-4400
Facsimile: (305) 579-0261

By: /s/ *Sherril Colombo*
SHERRIL COLOMBO
Fla. Bar No.: 0948799

CASE NO: 1:10-CV-20005-JORDAN/MCALILEY

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th of July, 2010, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel or record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Noticed Electronic Filing.

> Richard B. Burke, Esq.
> Biscayne Bldg., Suite 315
> 19 W. Flagler Street
> Miami, Florida 33130
> Telephone: (305) 373-2683
> Email: lawburker507@aol.com
>
> Martin Leach, Esq.
> Feiler & Leach, P.L.
> 901 Pone De Leon Blvd. #P
> Coral Gables, Florida 33134-3073
> Ph: 305-441-8818
> Email: mel@flmlegal.com
>
> /s/ *Sherril M. Colombo*
> SHERRIL M. COLOMBO

18
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

315953.1